```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                              MEMORANDUM
            -against-                                         AND ORDER
                                                              25-MJ-250 (TAM)
GUANGLI LIN,

                        Defendant.
-----------------------------------------------------------X
```

**TARYN A. MERKL**, United States Magistrate Judge:

On August 19, 2025, Defendant Guangli Lin was named in a removal complaint based on an indictment that was returned in the Southern District of California on May 16, 2025. Indictment, *United States v. Xiao Lei Xu, et al.*, No. 25-CR-1765 (TWR) (S.D. Cal.) (referred to herein as the indictment or "Ind."). The indictment charges Lin in two counts: conspiracy to commit wire fraud and mail fraud, in violation of 18 U.S.C. §§ 1349 and 2326 and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). The wire fraud conspiracy is alleged to have occurred "[b]eginning on a date unknown to the grand jury, but at least since 2019, and continuing up to 2023." (Ind. ¶ 6; *see also id.* ¶ 14 (alleging unknown beginning, "but at least since 2019, and continuing up to and including 2023" as to the money laundering conspiracy).)

As alleged in the indictment, Lin, together with others, was involved in a scheme that operated "tech support, bank impersonation, government impersonation, and refund scams targeting elderly victims throughout the United States." (Ind. ¶ 8.) The indictment further charges that "[m]embers of the conspiracy contacted potential victims through unsolicited interstate and foreign wire communications, including pop-up ads, emails and phone calls." (*Id.* ¶ 9.) According to the indictment, this outreach "caused victims to call the co-conspirators at a call center operating tech support,

government impersonation, bank impersonation, and refund scams." (*Id.*) From there, the conspirators sought to build trust with the victims, ultimately inducing "victims to send monies to other members of the conspiracy throughout the United States and the Southern District of California." (*Id.* ¶ 11.) The indictment further specifies that the conspiracy targeted potential victims over the age of 55. (*Id.* ¶ 12.)

The government has moved for Mr. Lin's removal in custody and argues that he poses both a risk of flight and a danger to the community. After lengthy oral argument on August 19, 2025, at which the government chose to proceed by proffer, the Court held an evidentiary hearing on August 20, 2025. At the evidentiary hearing, the government called one witness, Internal Revenue Service Criminal Investigator ("IRS-CI") Ryan Roberson, and introduced into evidence a demonstrative powerpoint containing summaries of various bank records and flight records; screenshots of text messages; photographs of packages, cash, and counterfeit drivers licenses for various states allegedly used by coconspirators; and other evidence regarding the alleged criminal organization and Lin's involvement in the conspiracy (referred to herein as "Gov't Ex.").[1] Based on the evidence presented regarding Lin's role in the underlying offenses, access to cash resources, and involvement with a large multi-national network that regularly utilized false identification documents in furtherance of its multi-year fraud scheme, the Court grants the government's application that Lin be removed to the Southern District of California in custody, with leave for Lin to present a bond package in the removing district.

---

[1] The exhibit was admitted into evidence for purposes of the August 20, 2025 hearing, with the exception of the first page, which included a demonstrative graphical depiction as to the structure and hierarchy of the alleged conspiracy. The Court did allow Special Agent Roberson to testify regarding the diagram and considers it a demonstrative exhibit.

2

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. Defendant Background

According to the information provided to Pretrial Services upon his arrest, Defendant Lin is a 30-year-old man who was born in China. He relocated to the United States in 2010 and became a naturalized citizen in 2018. The defendant's most recent travel outside the United States was a trip to China that Lin initially estimated was two years ago to visit his grandfather. According to the government, the date of travel was in February 2024. During his pretrial interview, Lin provided somewhat limited information. He indicated that his time in the community is seven years, provided his monthly income as $0, and provided no employment information, other than that he has been unemployed for two months but had previous employment as a sushi chef. Defendant Lin also reported some assets, including $5,000 in a bank account, and an interest in a property in Flushing, New York valued at approximately $1,200,000,[2] where he and his parents live. In reference to that property, the Pretrial Services report indicates that Lin represented that the monthly mortgage on that property is $5,500, and that he has a $1,200 monthly car payment for a BMW. In the meantime, Defendant Lin also indicated that his wife is employed as an accountant who earns approximately $1,000 per week.

Defendant's criminal history is minor. Specifically, Pretrial reported that he was arrested in October 2017 at the age of 22 in New Jersey on a misdemeanor charge of

---

[2] Evidence adduced at the hearing on August 20, 2025, included a screenshot regarding the property from the New York City Department of Finance property record-keeping system, which showed that the purchase price of the property was $1,460,000 on October 10, 2019, with the deed assigned to Defendant and his sister. (Gov't Ex. 1, at 15.)

3

credit card theft, to which crime he pled guilty and was sentenced to a 12-month diversion program that he completed.

Defendant presented three sureties in support of a proposed bond package: his wife, sister, and father. At the August 20, 2025 hearing, the Court briefly interviewed the three proposed sureties under oath. Lin's wife represented that she and Lin met in 2017, but that they married recently, in January 2025; they live together, with Lin's parents, in Flushing, at the property discussed above. Lin's wife further represented that she works as an accountant and makes about $50,000 per year. Lin's sister represented that she works as a home health aide earning approximately $30,000 to $35,000 per year; she stated that she lives ten minutes away from Lin, and she sees him several times per month. Finally, Lin's father represented that he lives with Lin, his wife, and Lin's mother; and that he works for a restaurant in Long Island, delivering takeout, earning approximately $20,000 per year. All three sureties represented at the evidentiary hearing that they believe Lin will abide by the conditions of release and that they would seek to ensure that Lin complies with pretrial release requirements. The Court found these proposed sureties credible and well-intentioned; there is nothing in the present record to suggest that they could not serve as responsible sureties.

**II. Government's Proffer and Evidence**

At the bail argument on August 19, 2025, the government moved for Defendant Lin's detention due to his alleged risk of flight and danger to the community, noting that Ninth Circuit precedent recognizes the risk of economic danger presented by individuals involved in significant fraud. *See, e.g.*, *United States v. Alzoubi*, No. 14-CR-3325 (BAS), 2015 WL 3485432, at *3 (S.D. Cal. June 1, 2015) ("Danger to the community may include pecuniary or economic harm." (citing *United States v. Reynolds*, 956 F.2d 192, 192–93 (9th Cir. 1992)).

4

By way of background on the scheme, the government proffered that the conspiracy here operated as a hub and spoke conspiracy, with spokes of the conspiracy responsible for collecting the monies sent to the conspirators from the victims. (*See* Ind. ¶ 11.) To facilitate the collection of packages of cash sent by the victims, according to the government, the conspirators utilized the addresses of short-terms rentals, which were frequently rented under false identities using fraudulent identification documents, through Airbnb. Notably, the conspiracy targeted elderly victims. All told, the government estimated that the evidence to date indicates that the victims suffered approximately $65 million in losses, with over 2,000 victims targeted. As a consequence, per the government, the sentencing exposure under the United States Sentencing Guidelines is significant.

The government further proffered that evidence gathered as part of the investigation established that Defendant Lin was involved with the leadership of the conspiracy in California for a significant period of time during the charged conspiracy. Specifically, the government argued that the evidence, which includes, *inter alia*, geolocation data and communications records, shows that Lin became involved in the conspiracy as early as 2019 and that, over the years he was involved in the conspiracy, he moved up in the ranks, ultimately becoming a trusted member who was close to the leader of the conspiracy in Southern California. In support of their argument that Lin was involved at a high level in the scheme, the government proffered that Lin was frequently in, and appeared to be living in, Southern California (Orange County) with the leader of the organization for some period of time starting in 2019. The evidence to establish this includes, *inter alia*, geolocation data and bank records; in addition, according to the government, a search of Lin's google account data revealed over 1,000 google searches for the home address of the leader of the conspiracy in Southern

5

California between July 2021 and September 18, 2023, the date the records were produced by Google. The government also proffered that one high-level member of the conspiracy who was closely associated with Lin recently fled to China.

At the evidentiary hearing, the government offered evidence in support of their request for detention. As to Lin's role in the scheme, the government offered evidence that Lin served, in part, as a driver of cash obtained through the fraudulent scheme, contending that flight records indicate that, since 2019, Lin has taken a significant number of one-way flights within the United States, including frequent trips from Los Angeles to Las Vegas. (*See* Gov't Ex. at 9.) Those trips were, according to the information learned during the government's investigation, for the purpose of collecting cash from the spokes of the conspiracy (the addresses where monies were mailed by victims) for the purpose of bringing the cash back to the hub. As an example, the government offered evidence that Lin, together with Xiao Lei Xu, and Hua Wang, two other leaders of the scheme in the United States, was stopped by law enforcement on March 12, 2021, in San Bernadino County, California, upon which law enforcement discovered $120,080 in cash in the vehicle, which was seized. Although he was not charged in connection with that specific seizure, the government argues that the seizure provides an example of the role Lin played in the conspiracy at that time, while also illustrating his relationship to the leaders of the conspiracy and ready access to cash.[3]

---

[3] The government also presented evidence regarding another San Bernadino County seizure of $70,000 approximately one week earlier, on March 4, 2021, related to a car stop in which Xiao Lei Xu was found with the cash concealed in a bag in his vehicle. (*See* Gov't Ex. at 6.)

The government also provided communications records reflecting Lin's inclusion in group messages with individuals who the government contends are high-ranking members of the conspiracy. (*See id.* at 10–13.)

In addition to his role in the fraud scheme, the government offered evidence concerning very recent cash deposits made by Lin and another individual at a JPMorgan Chase bank in Queens, New York, on or about August 4, 2025, which generated a currency transaction report dated August 15, 2025, because, in Chase's estimation, the deposits were indicative of structuring. Specifically, Chase reported that Lin, together with another individual, made two cash deposits, one in the approximate amount of $1,900, and the second in the amount of $8,800, which together exceeded $10,000. (*Id.* at 20.) The government also noted that Lin regularly paid his credit card bills by making ATM cash deposits, including approximately $60,000 in cash deposits during the period from February 2019 to June 2023. (*See id.* at 19.) The government further proffered that bank and credit card records show that Lin received numerous unexplained cash deposits, which were effectuated in Southern California.

Based on that evidence, the government argues that Lin has not been continuously living in the New York area for the last seven years as was reported to Pretrial Services, and that Lin's lifestyle is not consistent with his reported income and

---

Notably, the government also introduced an excerpted summary of flight records showing that shortly after these encounters with law enforcement, several members of the conspiracy, including Defendant Lin, flew from Los Angeles to New York. (*See id.* at 8.) The government argued that this law enforcement detection led the conspirators to start utilizing New York area addresses as spokes, which was illustrated by screenshots of text messages discussing packages and amounts of money, which screenshots were seized from a conspirator's cell phone pursuant to a search warrant. (*See id.* at 10 (discussing packages being shipped to addresses in Queens, New York, and varying numbers that appear to relate to amounts of money, e.g., "10K," "8k," $4300, $10,000); *see also id.* at 11–13.) The government argued that Defendant Lin was a participant in these chats and sent some of the texts regarding these packages, based on his name appearing as the sender of the texts. (*See id.*)

7

employment history. The government further contends that, due to his close contacts with the hierarchy of the conspiratorial organization, Lin has access to the resources to flee, namely, cash and false identification documents.[4] In addition to the monies generated through the charged fraud scheme, the government also offered evidence that, between February 2019 and June 2019, Lin received in his JPMorgan Chase checking account three separate wires, totaling $120,745; the wires were traced back to China but no evidence has established who sent the wires and why, or whether they are connected to the conspiracy.[5] (*See id.* at 16.)

### III. Proposed Bail Package

Lin contends that bond is appropriate in this case under the Bail Reform Act and argues that the Court should release Lin on a $300,000 bond co-signed by three sureties, Lin's wife, sister, and father. In addition, Lin's counsel suggested the imposition of various conditions, such as electronic or GPS monitoring, as well as a restriction on access to banking and money systems, to the extent the Court has a concern about unexplained access to cash.

## DISCUSSION

### I. The Bail Reform Act

The Bail Reform Act provides that pretrial detention of a defendant shall be ordered if, after a hearing, the judge "'finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the

---

[4] The government conceded that there is no evidence indicating that Lin has previously utilized false identification documents but argued that he would still have access to false identification documents due to his role in the conspiracy.

[5] At the evidentiary hearing, defense counsel posited that at least some of this money was wired by the family of Lin's first wife, but no evidence was adduced to establish the true origin of the wires.

8

safety of any other person and the community.'" *United States v. Mattis*, 963 F.3d 285, 290 (2d Cir. 2020) (quoting 18 U.S.C. § 3142(e)(1)). The court must consider the following factors set forth in section 3142(g) in making this determination:

> (1) the nature and the circumstances of the offense charged . . . ;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including [his] character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and . . .
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g); *see also United States v. Zhang*, 55 F.4th 141, 149 (2d Cir. 2022) (explaining that the court shall consider these four factors in determining whether there are conditions that will reasonably assure the defendant's appearance).

"[T]he weight given to each factor will inevitably vary from case to case, and might even vary depending on whether the inquiry relates to a defendant's danger or to his risk of flight." *Zhang*, 55 F.4th at 149–50. It is well settled that a finding that the defendant presents a flight risk must be supported by a preponderance of the evidence, *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007), and a finding that the defendant is dangerous must be supported by clear and convincing evidence, *United States v. Artis*, 607 F. App'x 95, 96 (2d Cir. 2015); *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995).

## II. Analysis

### A. The Nature and Circumstances of the Crimes Charged

The conspiracy and fraud charges against Lin are serious. The maximum statutory penalty on Count One is 40 years in prison. *See* 18 U.S.C. §§ 1349, 1343 (providing for a maximum 30-year sentence) & 2326 (providing for a 10-year enhanced

9

penalty for offenses victimizing more than 10 or targeting individuals over the age of 55). Moreover, if convicted, the government contends that Lin would face several sentencing enhancements under the guidelines (due to the significance of the loss amounts and the fact that the scheme targeted elderly victims), which could cause his guidelines to exceed the 40-year statutory maximum penalty on Count One. "When faced with the possibility of a significant prison term, defendants have a strong incentive to flee." *United States v. Boustani*, 356 F. Supp. 3d 246, 252 (E.D.N.Y. 2019) (citing *Sabhnani*, 493 F.3d at 66–67, 76). Accordingly, the Court finds that the nature and circumstances of the offenses favor detention.

### B. Weight of the Evidence

The Court views the weight of the evidence against Lin as strong. The government has offered evidence suggesting that Lin has been a part of the conspiracy for many years and that he was closely involved with the leadership of the conspiracy in Southern California. This factor supports detention. *Zhang*, 55 F.4th at 151 ("Where, as here, the evidence against a defendant is strong, it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight.").

### C. History and Characteristics of the Defendant

As discussed earlier, when assessing a defendant's characteristics, the Court looks to "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3). On the current record, the Court finds that this factor weighs in favor of detention, but only somewhat.

As an initial matter, as noted above, the Court does not question the veracity and sincerity of Lin's proposed sureties. But other than establishing ties to his immediate family, the record is slim on evidence regarding Lin's personal history and other community ties. In addition, many of the representations made in the pretrial report are not consistent with the representations made and evidence adduced at the detention hearing. For example, Lin has represented that he has lived in New York for seven years, and although that may have been his domicile, the government has provided evidence that he spent at least part of those seven years traveling in the Southern District of California and around the country as part of the criminal conspiracy.

The Court also has concerns about the seeming mismatch between Lin's representations as to his finances and the government's evidence, as well as a lack of evidence regarding his work history. Lin represented that he is unemployed, with no monthly income; he claims to have previously worked at a sushi restaurant for an unspecified period of time. But, at present, there is simply no evidence regarding Lin having a history of legitimate employment, which the Court finds indicative of a risk of flight. *See United States v. Atomei*, No. 24-CR-78 (MKB), 2024 WL 1934195, at *4 (E.D.N.Y. May 2, 2024) (finding lack of employment weighs in favor of risk of flight finding). The Court's concern about this lack of evidence is compounded by Lin's representation to Pretrial Services that his monthly expenses are over $6,000, which far exceed his wife's income. Although it is certainly possible he receives legitimate financial support from other family members, on the present record, the Court finds that Lin's income and lifestyle are inconsistent with the personal history he is claiming to the Court. Furthermore, the government has offered evidence that, as recently as 2019, Lin received large sums of money from individuals in China, indicating that Lin may have access to financial resources abroad. (*But see supra* note 5.)

11

In sum, what is currently known about Lin's personal history does not weigh in favor of pretrial release. However, the Court notes that further information as to Lin's personal history, circumstances, and financial means could be potentially elucidated so as to assuage concerns about his risk of flight. The Court also recognizes that his sureties may be able to help ensure that Lin returns to court. On balance, however, the Court finds that this factor weighs in favor of detention.

D. **Defendant Presents a Risk of Flight**

After evaluating the § 3142(g) factors, the Court finds that the government has established, by at least a preponderance of the evidence, that Lin poses a risk of flight. As discussed above, the severity of the charges, the weight of the evidence, and Lin's history and characteristics as currently known to this Court all suggest a flight risk.

Importantly, the specific contours of the alleged criminal scheme at issue here are conducive to flight. "As this Court has observed, a defendant's alleged ties to a large [ ] syndicate indicate that he has strong connections to people who have the resources to, ability to, and interest in helping him flee the jurisdiction favors denying bail." *Boustani*, 356 F. Supp. 3d at 253 (alteration in original) (quotation marks omitted); *see, e.g.*, *United States v. Baig*, 536 F. App'x 91, 93 (2d Cir. 2013) (summary order); *Sabhnani*, 493 F.3d at 76. Here, while there is no evidence that Lin has previously used false identification documents himself, there is significant evidence demonstrating that he would have access to a network of individuals who can supply such documents, as well as substantial financial resources, through the criminal conspiracy or other sources abroad. *See Baig*, 536 F. App'x at 93. Lin's prior receipt of large unexplained sums through wire transfers from China and cash deposits effectuated in Southern California further indicate that Lin has access to funds that could facilitate flight.

Lin's counsel has argued that because Lin has not previously indicated signs of flight nor attempted to flee, his lack of prior flight indicates that he would comply with pretrial release. This argument is unavailing, particularly given the severity of the sentence Defendant faces if convicted. *See United States v. Wang*, No. 23-CR-118-3 (AT), 2023 WL 4551637, at *2 (S.D.N.Y. July 14, 2023) (finding that a defendant had "more incentive to flee" after she was charged than she did when the government began seizing funds from another defendant's business). The Court finds that the government has met its burden of proving, by a preponderance of the evidence, that Lin is a flight risk. *Sabhnani*, 493 F.3d at 75.

### E. No Conditions of Release will Reasonably Assure Defendant's Appearance in Court

Finally, based on the present record, the Court finds that no set of conditions of release would reasonably assure Defendant's appearance to face the charges in California. This is notwithstanding the Court's finding that all three proposed sureties appeared credible, genuine in their stated commitment to ensuring Lin cooperates with the terms of pretrial release, and are likely in a position to provide some "moral suasion" over Lin. *United States v. Batista*, 163 F. Supp. 2d 222, 224 (S.D.N.Y. 2001).

The proposed bail package does not sufficiently address the Court's concerns about Lin's risk of flight, and current information provided to the Court as to Lin's personal history and characteristics does not illustrate that he has deep community ties here in the Eastern District of New York and even less so in the Southern District of California. Additionally, electronic monitoring via an ankle bracelet and/or home detention are not sufficient to prevent flight in the specific circumstances of this removal proceeding. Unlike a case where the Court need only assess ensuring that a defendant returns to court in the district of arrest, here, Lin will be expected to travel

13

across the country to participate in his criminal case in California while living in New York, should the Court grant his release on the bond presently suggested.[6] Given the risk of flight inherent in travel and the ease with which electronic or GPS monitoring may be thwarted, this Court finds that these measures are insufficient. *See, e.g.*, *Atomei*, 2024 WL 1934195, at *5 ("[A]s other courts in this circuit have found, location monitoring is inadequate because ankle monitors can be easily removed and ensure only a reduced head start should [a defendant] decide to flee."); *United States v. Brennerman*, 705 F. App'x 13, 16 (2d Cir. 2017) (summary order).

Given the current record, the Court finds that there is no set of conditions that reasonably assure Lin's future appearance. However, the Court notes that more information about Lin's personal history, or a different set of conditions fashioned to ensure his appearance in the Southern District of California, as opposed to the Eastern District of New York, could render pretrial release appropriate. The Court therefore grants the government's motion to remove Lin in custody, but without prejudice to Lin's being able to present a bond package to the California court.

---

[6] Counsel also posited that Lin could relocate to California, but the Court declines to speculate as to the likelihood of that occurring and under what circumstances and makes no findings about this hypothetical possibility. The Court also notes that counsel suggested a third-party custodian could travel with Lin as needed to California. But in this Court's view, the viability of such a proposal is best left to the removing district.

## CONCLUSION

For the foregoing reasons, the government's motion to remove Lin in custody is granted, and he is ordered removed to the Southern District of California, with leave to apply for release in the removing district.

**SO ORDERED.**

Dated: Brooklyn, New York
August 21, 2025

*Taryn A. Merkl*
_____
TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE